UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CAROL LINELL and CECELIA EDELMANN,

        Plaintiffs,

   -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, KAYE HOULIHAN, in her
Official and Individual Capacity, THOMAS
OBERLE, in his Official and Individual Capacity,
and CHRISTINE CICCARONE, in her Official
and Individual Capacity,

        Defendants.
-------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
15-CV-5085 (CBA) (ST)

**AMON, United States District Judge:**

Retired teachers Carol Linell and Cecelia Edelmann (collectively, "Plaintiffs") filed this

action in July 2015 in New York Supreme Court, County of Kings. (D.E. # 1.) Defendants the

New York City Department of Education ("DOE"), Principal Kaye Houlihan, Assistant Principal

Thomas Oberle, and Assistant Principal Christine Ciccarone (collectively, "Defendants") removed

it to this Court in September of that year. (D.E. # 63-1 ("Edelmann 56.1") ¶¶ 210–11; D.E. # 66

("Linell 56.1") ¶¶ 210–11.) In 2016, this Court dismissed a number of Plaintiffs' claims.[1] The

---

[1] In their Amended Complaint, both Plaintiffs brought age discrimination claims under federal law, New York State law, and New York City law, as well as negligence, negligent supervision, and negligent training claims under the New York State common law. (D.E. # 14-1 ("Am. Compl.") ¶¶ 138–64.) Additionally, Edelmann brought gender and disability discrimination claims under federal, state, and city law, and Linell brought state law claims for defamation and a federal claim for First Amendment retaliation. (Id.)

Following oral argument on Defendants' motion to dismiss, the Court dismissed the following claims:

    (1) Edelmann's Americans with Disabilities Act claim; Edelmann's disability-discrimination claims under New York State Human Rights Law and New York City Human Rights Law against the Department of Education ("DOE") and the individual defendants in their official capacities; (2) Edelmann's age-discrimination claims against defendant Houlihan; (3) Linell's age-discrimination claims against defendants Houlihan and Oberle; and Linell's age-discrimination claim under § 1983 against the DOE; (4) Linell's retaliation claim; and (5) Plaintiffs' negligence claims.

(D.E. dated May 9, 2016.) In a subsequent Memorandum and Order, the Court limited Linell's defamation claims to the one arising out of a November 2013 disciplinary letter. (D.E. # 43.)

1

only federal claims remaining before the Court are (1) Linell's and Edelmann's age discrimination claims and (2) Edelmann's sex discrimination claims. (Compare D.E. # 14-1 ("Am. Compl.") ¶¶ 138–64, with Minute Entry & Order dated May 9, 2016.) The Court now grants Defendants' motion for summary judgment with respect to these claims and declines to exercise supplemental jurisdiction over Plaintiffs' remaining state claims.

## BACKGROUND

For nearly two decades, Plaintiffs Carol Linell and Cecelia Edelmann taught at Fort Hamilton High School in Brooklyn, New York. (Edelmann 56.1 ¶ 1; Linell 56.1 ¶ 1.) This action arises out of the events that led Linell and Edelmann to retire prematurely at the start of the 2014–2015 school year, about two years after Defendant Kaye Houlihan became Fort Hamilton's principal in the fall of 2012 and approximately a year and a half after Defendant Christine Ciccarone became Linell's supervising assistant principal in January 2013. (Edelmann 56.1 ¶¶ 2–4; Linell 56.1 ¶¶ 2–4, 112.) Defendant Thomas Oberle became Edelmann's supervising assistant principal in 2001, long before the change in administration brought Houlihan and Ciccarone to Fort Hamilton. (Edelmann 56.1 ¶¶ 23–24.)

### I.     Linell

Linell began working at Fort Hamilton as a special education teacher in 1990 and retired in October of 2014. (Linell 56.1 ¶¶ 107, 202.) Linell testified at her deposition that she first thought about retiring during the 2013–2014 school year, when she began receiving what she perceived to be negative evaluations. (Id. ¶¶ 202–04.) She retired at the start of the following year, she says, after finding out that Ciccarone would be evaluating Linell once again and after receiving what she deemed to be rude emails from Ciccarone. (Id. ¶¶ 202–04.) Indeed, Linell testified that she was motivated to retire because of Ciccarone's "attitude" and because of the way

2

Ciccarone spoke to her. (Id. ¶ 205.) Linell also stated that, had she stayed at Fort Hamilton through the end of the 2014–2015 school year, she would have received a rating of Ineffective. (Id. ¶ 206.) Linell "didn't want to retire at all," but testifies that her work environment had gotten "very bad" and, ultimately, her deteriorating physical and mental health forced her to retire. (Id. ¶ 203.)

One source of the sudden friction between Linell and the Fort Hamilton administration appears to be the change in evaluation systems between the 2012–2013 and 2013–2014 school years. From 1990 through 2013, Linell taught five periods of Resource Room and no other classes, and she always received a rating of Satisfactory. (Id. ¶¶ 109–10.) The evaluation system in place during that time allowed only for binary overall evaluations: Satisfactory or Unsatisfactory. (Edelmann 56.1 ¶¶ 5–10; Linell 56.1 ¶¶ 5–10.) Starting with the 2013–2014 school year, however, DOE implemented a new evaluation system, which allowed for evaluations on a four-point scale across 22 teaching components. (Edelmann 56.1 ¶¶ 5–10; Linell 56.1 ¶¶ 5–10.) That is, administrators would evaluate teachers across several teaching components and would assign them ratings of Highly Effective, Effective, Developing, or Unsatisfactory for each component. (Edelmann 56.1 ¶¶ 5–10; Linell 56.1 ¶¶ 5–10.) Pursuant to the new evaluation system, Houlihan and Ciccarone evaluated Edelmann four times throughout the 2013–2014 school year, rating her Highly Effective in one component, Effective in twenty-seven components, Developing in nineteen components, and Ineffective in three components. (Linell 56.1 ¶¶ 155, 159–60, 165–66, 169–70.)

Another source of the friction between Linell and her supervisors was Houlihan's new policy that special education teachers should no longer teach resource room exclusively. Houlihan testified at her deposition that she changed this school policy because, in her view, the course could offer students more than mere homework assistance and test preparation. (Id. ¶¶ 177–78, 180–

3

82.) After seeking input from an outside consultant with experience in special education, Fort Hamilton's administrators determined that teaching in a content area would make the teachers more structured and effective in the resource room. (Id.) This change in policy also allowed the administrators to ensure that credit-bearing classes would be covered and distributed such that no teacher would be left teaching too many different subjects. (Id.) As a result, the 2014–2015 school year was the first one in which Linell did not receive a full schedule of resource room classes, receiving three periods of resource room and two periods of special education English instead. (Id. ¶¶ 110, 175.) During that school year, no teacher received more than three periods of resource room, though Linell was also given an opportunity to teach a fourth period of resource room for extra pay, which she declined because she did not want the increased workload. (Id. ¶¶ 184–85.) Linell testified that her new schedule was not one of the reasons that factored into her decision to retire. (Id. ¶ 208.)

Linell also testified that Houlihan and Ciccarone did not like Linell personally. (Id. ¶ 195.) Again, according to Linell's deposition testimony, one of the reasons she retired was Ciccarone's general "attitude" and the way she spoke to Linell. (Id. ¶¶ 204–05.) This personal animosity appears to have manifested itself in emails Ciccarone sent to Linell while she was out sick on September 9, 10, and 11, 2014. (Id. ¶ 187.) Ciccarone emailed Linell to inquire about emergency lesson plans for Linell's two English classes, and Linell stated that the emails were part of the reason she retired in October of that year. (Id.)

Linell, who was 58 years old at the time of her deposition, supports her age discrimination claims with her testimony as to one purportedly ageist statement by each of Houlihan and Ciccarone. According to Linell, Houlihan once said, "we have hired some new, young teachers." (Id. ¶ 194.) Linell also testified that, at a staff meeting, Ciccarone said, "I have hired a nice, new,

4

young psychologist." (Id. ¶ 196.) Linell takes issue with the youth of Fort Hamilton's new hires more generally, though she admits that she does not know whether older teachers applied for these positions. (Id. ¶¶ 197–98.)

## II.    Edelmann

Four years after Edelmann began working at Fort Hamilton as an art teacher in 1997, the school promoted Oberle from teacher to assistant principal. (Edelmann 56.1 ¶¶ 23–24.) As Edelmann's supervising assistant principal, Oberle rated Edelmann Satisfactory in each of her performance evaluations from 2001 to 2013. (Id. ¶¶ 26, 37.) The relationship between Edelmann and Oberle was not as good as it appeared on paper, however, as Edelmann needed a six-month medical sabbatical at the start of the 2013–2014 school year because of "increasing levels of anxiety, which were manifested by physical symptoms due to the adverse treatment at the hands of AP Oberle." (Id.) This absence included hospitalizations for digestive problems and weight loss, caused at least in part by stress. (Id. ¶ 38.) In the two months following Edelmann's return to Fort Hamilton in February 2014, Oberle observed Edelmann on two occasions and rated her Highly Effective in four components, Effective in seventeen components, Developing in seven components, and Ineffective in one component. (Id. ¶¶ 39, 43–46.) Edelmann then stopped appearing for work, because she developed Post Traumatic Stress Disorder due to what she perceived to be an unpleasant situation at Fort Hamilton. (Id. ¶¶ 40, 100.) Effective September 9, 2014, DOE approved Edelmann for disability retirement, a benefit reserved for teachers who are "physically or mentally incapable of performing [their] work duties." (Id. ¶¶ 104–05.)

According to Edelmann, one of the primary causes of her disability retirement and associated mental health problems was Oberle's requests that Edelmann attend and take notes at teacher team meetings. During the 2012–2013 school year, the year before Edelmann's sabbatical,

Oberle asked Edelmann to run teacher team meetings. (Id. ¶ 54.) Team meetings were meant to "encourage collaboration, resource-sharing, and discussion of best practices." (Id. ¶ 57.) They occurred infrequently starting in 2009, but were held weekly by the time Edelmann took disability retirement. (Id. ¶ 56.)

Edelmann's responsibilities for team meetings during the 2012–2013 school year included discussing topics with Oberle beforehand and taking minutes during meetings. (Id. ¶¶ 55, 58.) Edelmann eventually asked that Oberle rotate teacher team meeting responsibilities and, before the start of the 2013–2014 school year, asked that "someone take over the team teaching prep and record keeping." (Id. ¶¶ 55, 59–60.) Edelmann testified that she was the only teacher in her department asked to take on these responsibilities during the 2012–2013 school year, and that Oberle did not accommodate her request for a rotation of teacher team meeting responsibilities. (Id. ¶¶ 61–62.) Oberle's written instructions to his teachers, however, show that he directed them to rotate the task of taking minutes at team meetings during the 2013–2014 school year. (Id. ¶ 65.)

That year, Oberle placed Edelmann with a team of teachers that met during fifth period. (Id. ¶ 67.) This was the period during which Edelmann would eat lunch and, indeed, many teachers ate lunch during the team meetings. (Id. ¶¶ 55, 68–69.) But, late in January of 2014, while Edelmann was still on sabbatical, she received a doctor's note stating that she would "require a dedicated mid-day lunch break." (Id. ¶ 49.) Upon her return, Edelmann complained that the teacher team meetings interfered with her lunch period, because she could not eat properly during the meetings. (Id. ¶¶ 69–70.) Accordingly, Oberle revised the team-meeting schedule so that Edelmann could attend meetings during second period, which she did, beginning in her first month back from sabbatical. (Id. ¶ 71.) Oberle allowed Edelmann to attend whichever meetings she preferred because, although the discussions at teacher team meetings were general, involving

subjects such as "lesson planning," teachers in the business department generally attended the second period meetings while Edelmann's colleagues from the art department generally attended the fifth period meetings. (Id. ¶¶ 73–74; Oberle Dep. at 45:4–8.)

Edelmann complains of other meetings Oberle asked her to attend upon her return from sabbatical as well, claiming that they were so obviously pointless that Oberle was purposely setting her up to fail. First, Edelmann argues that Oberle's request that she attend a lunch-hour literacy workshop was "inappropriate," because Edelmann was an art teacher. (Edelmann 56.1 ¶ 75.) Oberle offered Edelmann the opportunity to participate remotely so that she could benefit from the workshop without having to eat her lunch there but, after attending one or two workshops, Edelmann chose to skip the meetings altogether. (Id. ¶¶ 75–76.) Second, Oberle asked that Edelmann meet with teacher Gareth Ganim so that she could discuss a component of his teaching and learn from him. (Id. ¶ 77.) Edelmann, who met with Mr. Ganim once or twice, now takes this request by Oberle as a slight, because Oberle gave that teacher a poor overall performance evaluation. (Id.)

At the core of Edelmann's accusations of workplace sabotage, however, is her testimony that, upon her return from medical sabbatical, she found her classroom filled with garbage and in complete disarray, with her classroom supplies missing and classroom equipment either missing or destroyed. (Edelmann Aff. ¶ 21.) Edelmann testifies further that Oberle refused to assist Edelmann in cleaning her classroom—despite several requests for help—and then had his secretary call Edelmann's classroom several times per day, during class, even though he knew that Edelmann was teaching at the time. (Id. ¶¶ 21, 54–55.) Finally, Edelmann complains that Oberle failed to give her a key to the nurse's bathroom near Edelmann's classroom. (Edelmann 56.1 ¶ 49.) Edelmann requested special access to the nurse's bathroom because her doctor's note stated

that she might "need frequent bathroom breaks throughout the day." (Id.) The nurse's bathroom was the closest one to Edelmann's classroom as well as the easiest one to access between periods, though Edelmann did have access to another bathroom "very close" by. (Id. ¶¶ 50–52; Edelmann Dep. at 87:6–12.)

Edelmann supports her discrimination claims with the following testimony:

- Oberle "repeatedly said things to [Edelmann] about being able to get two teachers for [her] salary." (Edelmann Dep. at 32:17–19.)

- Oberle said that the school did not need one particular substitute teacher because he was "too old" and that the school needed "someone young." (Id. at 31:13–15.)

- Oberle once asked whether Edelmann knew a particular teacher before saying, "Well, stay away from her. She's on her way out. She's old." (Id. at 32:10–11.)

- Oberle made several comments about who was retiring and asked Edelmann when other teachers were retiring. (Id. at 31:13–14.)

- Oberle reported that "Ms. General thinks you had a push up bra, but the consensus from over in Ms. Velucci's office was that you had a boob job." (Id. at 41:12–14, 55:8–10.)

- Oberle stated that Edelmann was dressed "inappropriately" when she was wearing a blue "short-sleeved t-shirt dress" over "yoga pants or leggings." (Id. at 39:2–25.)

- Oberle stated, more than once, that Edelmann would make a wonderful mother, despite knowing that she had undergone a hysterectomy. (Id. at 53:16–54:11.)

At his deposition, Oberle testified that he was 49 years old. (Edelmann 56.1 ¶ 25.) Edelmann testified that she was 51 years old. (Id. ¶ 25.)

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed factual issues but to determine whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and ellipses omitted) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)). No genuine issue exists unless there is sufficient evidence for a jury to return a verdict for the nonmoving party. Anderson, 477 U.S. at 248.

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223–24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought"; they cannot rest on mere allegations or denials. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). The court does not, however, defer to a party's legal arguments on summary judgment because, "with respect to a motion for summary judgment, questions of law are for the court." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 534 (2d Cir. 1993).

## DISCUSSION

For the reasons set forth below, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' federal claims and then declines to exercise supplemental jurisdiction over Plaintiffs' remaining state claims.

### I. Linell's and Edelmann's Age Discrimination Claims

In their Amended Complaint, Linell and Edelmann appear to bring their age discrimination claims under both 42 U.S.C. § 1983 and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"). (See Am. Compl. ¶ 139.) The Court grants summary judgment to Defendants with respect to these § 1983 and ADEA claims, because Plaintiffs have provided insufficient evidence upon which a reasonable jury could find that the Plaintiffs suffered adverse employment actions, hostile work environments, or constructive discharges.

### A. Adverse Employment Action Under the McDonnell Douglas Framework

Age discrimination claims under § 1983 and ADEA are assessed under the three-step burden-shifting analysis first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (§ 1983); Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (ADEA). The first step of the McDonnell Douglas analysis requires that plaintiffs establish a prima facie case of discrimination. Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010). To establish a prima

facie case of age discrimination, a plaintiff must establish (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she suffered an adverse employment action, and (4) that the adverse employment action occurred under "circumstances giving rise to an inference of discrimination." Terry, 336 F.3d at 137 (ADEA); accord D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 194–95 (2d Cir. 2007) (ADEA); Piccone v. Town of Webster, 511 F. App'x 63, 64 (2d Cir. 2013) (age discrimination under § 1983).

An adverse employment action is "'a materially adverse change in [the plaintiff's] employment status' or in the terms and conditions of his employment." Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006) (quoting Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004)). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). "Such a change 'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Davies v. N.Y.C. Dep't of Educ., 563 Fed. App'x 818, 820 (2d Cir. 2014).

### 1. Unfavorable Schedules or Work Assignments

Here, Linell's age discrimination claim does not rely on any suggestion that she suffered a loss in salary, benefits, or promotional opportunities; rather, she argues that she suffered an adverse employment action when Defendants assigned Linell only three periods of resource room for the 2014–2015 school year, not her preferred schedule of five. (Linell Opp. at 23–26.)

But, "[w]here assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments does not, without more, rise to the level of an adverse employment action." Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (quoting Williams v. Ford Motor Co., No. 12–CV–0411, 2014 WL 1572302, at *13 (W.D.N.Y. Apr. 18, 2014) (collecting cases)). For example, in Galabya, the Second Circuit affirmed the district court's grant of summary judgment with respect to the plaintiff's age discrimination claims, holding that the transfer of a teacher out of special education middle school keyboarding class in one school to mainstream high school keyboarding class in another school was not an adverse employment action.[2] 202 F.3d at 640–42; see also, e.g., Briante v. Longwood Cent. Sch. Dist., No. 15-CV-3200 (DRH) (GRB), 2016 U.S. Dist. LEXIS 34041, at *9–10 (E.D.N.Y. Mar. 16, 2016) ("That plaintiff was assigned to teach science and social studies, subjects for which she was certified, over her preferred assignment to teach math does not constitute an adverse employment action."); Klein v. N.Y. Univ., 786 F. Supp. 2d 830, 849 (S.D.N.Y. 2011) ("Klein's mere dissatisfaction with her teaching schedule is not sufficient to support a finding of a material adverse action."); Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d 249, 264–65 (E.D.N.Y. 1999) (holding that the defendants' decision to schedule the plaintiff to teach pre-kindergarten rather than first grade was not an adverse employment action, despite the plaintiff's preference to teach first grade and her argument that pre-kindergarten was a demotion).

---

[2] Edelmann attempts to argue that she was "transferred" in a similar way when Oberle afforded her the opportunity, at her request, to attend teacher team meetings during second period, even though business department teachers generally attended those meetings. (See Edelmann Opp. at 27.) Edelmann also argues that she was "transferred" when Oberle attempted (unsuccessfully) to have Edelmann attend literacy workshops and meetings with Mr. Ganim, another Fort Hamilton teacher. (See id.) These actions hardly constitute transfers. In any case, the Second Circuit affirmed the district court's grant of summary judgment to the defendants in Galabya, because the plaintiff there could not establish an adverse employment action. See Galabya, 202 F.3d at 641. Edelmann's attempt to rely on Galabya while also distinguishing it is unavailing, because Edelmann has provided no evidence upon which a reasonable jury could find that Edelmann's "transfers" created any "materially significant disadvantage[s]." Id.; see also supra.

Not only does Linell fail to distinguish this line of cases, which Defendants cited in their opening brief, she fails to cite a single case that supports her theory of adverse employment action. (See Linell Opp. at 23–26.) When pressed at oral argument on her inability to show an adverse employment action, Linell cited <u>Durick v. New York City Department of Education</u>, 202 F. Supp. 3d 277 (E.D.N.Y. 2016). Unfortunately for Linell, that case hurts rather than helps her argument. Adele Durick was a teacher at Fort Hamilton who retired early, in 2014, and then asserted age- and disability-discrimination claims against DOE based on the conduct of Houlihan and Ciccarone. See <u>id.</u> at 282, 285. Although Durick survived summary judgment on her disability discrimination claims, the court granted summary judgment in DOE's favor with respect to Durick's age-discrimination claims. See <u>id.</u> The court there specifically rejected Durick's argument that her schedule of "three resource room classes and two self-contained classes, rather than five resource room classes," constituted an adverse employment action in support of her age discrimination claim. <u>Id.</u> at 287–88. Linell similarly fails to show how her "unfavorable schedules or work assignments" constitute adverse employment actions. <u>Johnson</u>, 58 F. Supp. 3d at 224.

### 2. Excessive Work

Edelmann, on the other hand, argues that she suffered adverse employment actions when Oberle required that she take on extra responsibility at teacher team meetings, attend meetings during her lunch hour, and attend meetings that Edelmann deemed to be pointless. (Edelmann Opp. at 26.) She argues that these meetings were burdensome, and that they were a departure from normal academic practice because "these duties were above and beyond her teaching duties." (<u>Id.</u>)

Like unfavorable schedules or assignments, a claim of excessive work, without more, does not constitute an adverse employment action. <u>Fridia v. Henderson</u>, No. 99-CV-10749 (BSJ), 2000 WL 1772779, at *6 (S.D.N.Y. Nov. 30, 2000); see also <u>Johnson</u>, 58 F. Supp. 3d at 224 (holding

that "unfavorable schedules or work assignments" do not constitute adverse employment actions). Moreover, the record shows that team meetings were not a departure from normal academic practice, in that they had been held since 2009 in order to "encourage collaboration, resource-sharing, and discussion of best practices." (Edelmann 56.1 ¶¶ 56–57.) Without more, Edelmann's claims of an unfavorable schedule and of excessive work are insufficient to establish an adverse employment action.[3]

### 3. Negative Evaluations and Perceived Unfair Criticism

To the extent that both Plaintiffs argue that their negative evaluations and perceived unfair criticism constitute adverse employment actions, they are wrong, because they do not show how the evaluations or criticism affected the terms of Plaintiffs' employment.

Reprimands or negative evaluation letters constitute adverse employment actions only when they "trigger negative consequences to the conditions of employment." Trachtenberg v. Dep't of Educ., 937 F. Supp. 2d 460, 472 (S.D.N.Y. 2013); see also Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 756 (2d Cir. 2004) (holding that a negative employment evaluation and its critical addendum did not constitute an adverse employment action, because the plaintiff offered no proof that the evaluation had any effect on the terms and conditions of the plaintiff's employment); Gutierrez v. City of N.Y., 756 F. Supp. 2d 491, 507–08 (S.D.N.Y. 2010) (holding that the plaintiffs' negative employment evaluations did not rise to the level of adverse employment actions). For example, a teacher's unsatisfactory end-of-year ratings have satisfied the adverse employment action element of the McDonnell Douglas analysis where the plaintiff

---

[3] The Court finds unpersuasive Edelmann's attempt to supplement her inadequate showing of adverse employment action regarding her alleged unfavorable schedule and excessive work with her claim that Defendants failed to accommodate her disabilities. (See Edelmann Opp. at 26–27.) Her federal disability claims were dismissed, (see D.E. dated May 9, 2016), and the allegations underpinning that claim do not constitute adverse employment actions. Moreover, Edelmann alleged that these actions were taken on the basis of her disability, not her age.

proffered evidence that the consequences of such ratings included, among other things, removal from per session paid position, an inability to transfer within the school district, an inability to work in summer school, and a damaged professional reputation. Shapiro v. N.Y.C. Dep't of Educ., 561 F. Supp. 2d 413, 423 (S.D.N.Y. 2008). The same was true where the plaintiff proffered evidence that the negative evaluation "precluded him from the opportunity of participating in the Per Session Home Instruction Employment Program." Dressler v. N.Y.C. Dep't of Educ., No. 10-CV-3769 (JPO), 2012 WL 1038600, at *6–7 (S.D.N.Y. Mar. 29, 2012).

Where the plaintiffs have failed to show that negative consequences accompanied their negative performance evaluations and reprimand letters, however, district courts have repeatedly found no adverse employment action. See, e.g., Frankel v. City of N.Y., No. 06-CV-5450 (LTS), 2009 WL 465645, at *3 & n.1 (S.D.N.Y. Feb. 25, 2009) (negative performance evaluations); Siddiqi v. N.Y.C. Health & Hosps. Corp., 572 F. Supp. 2d 353, 367–68 (S.D.N.Y. 2008) (same); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 283–84 (S.D.N.Y. 1999) (Sotomayor, J.) (same); Honey v. Cty. of Rockland, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002) (reprimand letters placed in the plaintiff's file).

Here, Plaintiffs provide no evidence that their negative evaluations and perceived unfair criticism triggered any negative consequences to the conditions of their employment. Accordingly, no reasonable jury could find that Plaintiffs suffered adverse employment actions.

### B. Age-Based Hostile Work Environments

Where an employee has not experienced a specific adverse employment action, she may still have a viable age discrimination claim if her employer has created a hostile work environment. Gregory v. Daly, 243 F.3d 687, 691–92 (2d Cir. 2001); see also Terry v. Ashcroft, 336 F.3d 128, 147–48 (2d Cir. 2003) (describing the hostile-work-environment standard under Title VII and then

15

stating that "[t]he same standards apply to hostile work environment claims brought under the ADEA"). But, as a matter of law, neither Linell nor Edelmann has provided sufficient evidence that she suffered a hostile work environment.

To make out a successful hostile work environment claim, a plaintiff must prove (1) that her employer created "an environment that a reasonable person would find hostile or abusive," (2) that the plaintiff subjectively perceived her work environment to be hostile or abusive, and (3) that their employer created this hostile or abusive environment because of the plaintiff's status as a member of a protected class. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Gregory, 243 F.3d at 691–92); accord Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Plaintiffs will only prevail on such claims if they show that their workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [their] employment were thereby altered." Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013) (quoting Alfano v. Costello, 294 F.3d 365, 373–74 (2d Cir. 2002)). Plaintiffs meet this standard by showing "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotations omitted), superseded on other grounds by N.Y.C. Local L. No. 85. When a hostile work environment claim is based on a series of incidents, those incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Das v. Consol. Sch. Dist. of New Britain, 369 F. App'x 186, 189–90 (2d Cir. 2010) (quoting Alfano, 294 F.3d at 374); see also Littlejohn v. City of N.Y., 795 F.3d 297, 321 (2d Cir. 2015) (quoting Raspardo, 770 F.3d at 114). "When properly applied, these standards 'filter out complaints attacking the ordinary tribulations

of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Cintron v. Atticus Bakery, LLC, 242 F. Supp. 3d 94, 105 (D. Conn. 2017) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

In determining whether an incident or series of incidents is sufficiently severe or pervasive, a court "must assess the totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Raspardo, 770 F.3d at 114 (quoting Harris, 510 U.S. at 21).

### 1. Linell's Age-Based Hostile Work Environment Claim

In order to establish a hostile work environment, a plaintiff must show that her workplace was "'permeated with discriminatory intimidation, ridicule, and insult that [were] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320–21 (quoting Harris, 510 U.S. at 21). Linell argues that, from the fall of 2013 to her retirement in 2014, she suffered "targeted and pervasive treatment." (Linell Opp. at 27.) But the evidence supporting that conclusion consists only of (a) her receipt of an unfavorable class schedule for the 2014–2015 school year, (b) her receipt of what she perceived to be heightened scrutiny, and (c) one statement by each of Houlihan and Ciccarone to the effect that the administration had "hired some nice, new, young" teachers and psychologists. (See id. at 27–28; Linell 56.1 ¶¶ 194, 196.) In particular, Linell argues that she was subjected to heightened scrutiny when Ciccarone "unjustifiably harass[ed]" Linell about her missing lesson plans and because the school administration reprimanded Linell about her violation of PSAT testing protocol in a November 15, 2013 letter. (See Linell Opp. at 27–28.) Linell neither provides legal citations

to support her argument that these actions could create a hostile work environment, nor even argues that the treatment she received was "hostile or abusive." Patane, 508 F.3d at 113.

At most, Linell provides evidence of petty slights and trivial inconveniences, which do not create a hostile work environment. In Fleming v. Max Mara USA, Inc., for example, the Second Circuit affirmed the district court's grant of summary judgment, despite the evidence that "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books and sent rude emails." 371 Fed. App'x 115, 119 (2d Cir. 2010). In Trachtenberg v. Department of Education, the court concluded that the following allegations by a former teacher that are much more substantial those at issue here could not even survive a motion to dismiss. 937 F. Supp. 2d 460, 472 (S.D.N.Y. 2013). The allegations included that, for the last two years of her employment, the plaintiff was subjected to excessive scrutiny, received negative performance evaluations, and received letters from her principal that contained "scurrilous charges"; that the plaintiff was moved to a poorly ventilated and windowless office; that the plaintiff was refused training opportunities; and that the plaintiff was publicly scolded in front of her students and coworkers. Id. Trachtenberg also alleged that her principal would frequently stare at plaintiff in an effort to intimidate her. Id.

Similarly, in Briante, the court dismissed a hostile work environment claim because the following allegations were insufficient: that the plaintiff was assigned to teach science and social studies instead of her preferred subject of math; that she was assigned to teach a class with "extreme behavioral issues"; and that her principal unjustifiably accused her of misconduct, gave hear an unsatisfactory evaluation, asked when she was going to retire, and failed to intervene when a parent verbally attacked her. 2016 U.S. Dist. LEXIS 34041, at *11.

To the extent that Houlihan and Ciccarone's purportedly ageist statements are indicative of age discrimination at all, they are at most stray remarks insufficient to create a hostile work environment. See, e.g., Chick v. Cty. of Suffolk, 546 F. App'x 58 (2d Cir. 2013) (summary order) (affirming the district court's grant of the defendant's motion to dismiss where the plaintiff could point only to two remote, non-specific, and conclusory incidents); Brown v. Coach Stores, Inc., 163 F.3d 706, 713 (2d Cir. 1998) (holding that even "despicable and offensive" stray remarks "fail to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment"); Moore, 2016 U.S. Dist. LEXIS 16201, at *37 ("Isolated comments regarding a person's age, even in combination with allegations of rudeness and monitoring, do not rise to the level necessary to establish a hostile work environment due to age under the federal and state law."). Indeed, the record in this case suggests that the gravamen of Linell's claim "is rooted in conduct that amounts to nothing more than workplace dynamics—that is, personal enmity or personality conflicts." Davis-Molinia v. Port Auth. of N.Y. & N.J., No. 08-CV-7584 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (granting defendant's motion for summary judgment), aff'd, 488 F. App'x 530 (2d Cir. 2012). Linell nearly admitted as much in her deposition, when she testified that Houlihan and Ciccarone did not like her personally. (Linell 56.1 ¶ 195.)

Linell did not suffer a hostile work environment as a matter of law.

## 2. Edelmann's Age-Based Hostile Work Environment Claim

Edelmann has also failed to produce sufficient evidence to create a genuine issue of fact as to whether her workplace was "'permeated with discriminatory intimidation, ridicule, and insult that [were] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320–21 (quoting Harris, 510 U.S. at

21). In support of her age-based hostile work environment claim, Edelmann proffers evidence that Oberle often asked Edelmann when teachers were retiring, said that he could get "two teachers" for Edelmann's salary, commented that the school did not need a particular substitute teacher because he was "too old," and told Edelmann to "stay away from" another teacher who, according to Oberle, was "old" and "on her way out." (Edelmann 56.1 ¶¶ 85–88.)

The questions about retirement and the statement about Edelmann's salary are, at best, weak support for an age-based hostile work environment claim, because comments related to retirement, seniority, and salary are "common in offices, even between supervisors, and [are] typically unrelated to age discrimination." Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 447–48 (S.D.N.Y. 2007) (collecting cases); see also James v. N.Y. Racing Ass'n, 76 F. Supp. 2d 250, 256 (E.D.N.Y. 1999) (stating that the law does not forbid employers from recognizing "the economic realities of retaining older workers"). The inference of discrimination is especially difficult to make here, where Oberle is only two years younger than Edelmann. (Edelmann 56.1 ¶ 25.)

Even when bolstered by the two negative statements Oberle made about other "old" teachers at Fort Hamilton, no evidence suggests that these "relatively innocuous" statements and questions unreasonably interfered with Edelmann's work performance, were physically threatening or humiliating, or were anything more than episodic. See Almontaser v. N.Y.C. Dep't of Educ., No. 13-CV-5621 (ILG), 2014 WL 3110019, at *22 (E.D.N.Y. July 8, 2014). Indeed, the evidence here presents a work environment less hostile and abusive than the one in Almontaser. See id. Yet, in that case, despite the allegations there that the plaintiff's principal asked a student how he liked old people teaching, frequently told the plaintiff that he was "too old," and frequently asked the plaintiff when he was going to retire, the Court dismissed the plaintiff's age-based hostile

work environment claim. See id.; see also McGrath v. Thomson Reuters, No. 10-CV-4944 (JSR), 2012 WL 2119112, at *15 (S.D.N.Y. Apr. 30, 2012) (holding that evidence of plaintiff's supervisor referring to plaintiff as "old man," repeatedly and over a period of years, was insufficient to support a hostile work environment claim).

No reasonable jury could find that Edelmann's workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Desardouin, 708 F.3d at 105. Accordingly, Defendants are entitled to summary judgment on this claim.

### C. Plaintiffs' Age-Based Constructive Discharge Claims

Like a hostile work environment claim, a constructive discharge claim may stand even where an employee has not experienced a specific adverse employment action. See Trachtenberg, 937 F. Supp. 2d at 472. But neither Linell nor Edelmann suffered a constructive discharge as a matter of law.

A constructive discharge occurs only when, from an objective perspective, "the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Id. (quoting Morris v. Schroder Capital Mgmt. Int'l, 481 F.3d 86, 88 (2d Cir. 2007)); see also Petrosino v. Bell Atl., 385 F.3d 210, 230 (2d Cir. 2004). Similar to the hostile work environment standard, the constructive discharge standard requires that a plaintiff provide sufficient evidence upon which a reasonable jury could find "that the working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Morris, 481 F.3d at 89; see also Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d. 62, 73 (2d Cir. 2000); Stembridge v. City of N.Y., 88 F. Supp. 2d 276, 284 (S.D.N.Y. 2000) ("The Second Circuit has strictly construed the standard for determining

whether working conditions are intolerable . . . ."). This "standard is higher than the standard for establishing a hostile work environment." Fincher, 604 F.3d at 725. Indeed, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." Lugo v. Shinseki, No. 06-CV-13187 (LAK), 2010 U.S. Dist. LEXIS 67873, at *31 (S.D.N.Y. May 19, 2010) (quoting Penn. State Police v. Suders, 542 U.S. 129, 149 (2004)).

Here, neither Linell nor Edelmann has presented evidence upon which a reasonable jury could find that they suffered constructive discharges. See Fincher, 604 F.3d at 725; Lugo, 2010 U.S. Dist. LEXIS 67873, at *31.

Linell cannot establish that she was discharged simply because, from October 2013 to her October 2014 retirement, her working conditions were worse than those "she had come to expect." (Linell Opp. at 30.) Although Linell could theoretically have more success with her constructive-discharge argument premised on her employers deliberately seeking to place her "in a position that jeopardized [her] health," Linell fails to substantiate this argument with evidence. (Id. at 29–30 (citing Spence v. Md. Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993)).) Instead, Linell merely provides evidence of her deteriorating mental health and of how that forced her to resign. (Id. at 30 (quoting Linell 56.1 ¶ 203).) "But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of h[er] voluntarily undertaken position or from criticisms of h[er] performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer." Spence, 995 F.2d at 1156. Although it is certainly unfortunate that Linell "would get sick every morning while on her way to work and dreaded to enter Fort Hamilton High School," (id. (citing Linell 56.1 ¶ 294)), such facts neither suggest that her employer deliberately sought to place her in a position that jeopardized her

health, nor that, "objectively," "her working conditions became so intolerable that a reasonable person in her shoes would have felt compelled to resign." Geller v. N. Shore Long Island Jewish Health Sys., No. 10-CV-0170 (JS), 2013 WL 5348313, at *11 (E.D.N.Y. Sept. 23, 2013).

Accordingly, the Court grants summary judgment to Defendants with respect to Plaintiffs' federal age discrimination claims.

## II.    Edelmann's Sex Discrimination Claims

Edelmann's only argument in support of her sex discrimination claims is that Defendants subjected her to a hostile work environment. Defendants are entitled to summary judgment with respect to Edelmann's federal sex discrimination claims against Defendants, because Edelmann cannot establish that she suffered a sex-based hostile work environment.

As stated above, to make out hostile work environment claims, plaintiffs must show that their employer created a work environment that was both objectively and subjectively hostile or abusive, and that the employer did so because of the plaintiffs' status as members of a protected class. Brown v. Henderson, 257 F.3d at 252 (quoting Gregory, 243 F.3d at 691–92); accord Raspardo, 770 F.3d at 114 (quoting Harris, 510 U.S. at 21). Plaintiffs will prevail on such claims only if they show that their workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [their] employment were thereby altered." Desardouin, 708 F.3d at 105 (quoting Alfano, 294 F.3d at 373–74). In determining whether an incident or series of incidents is sufficiently severe or pervasive, a court "must assess the totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Raspardo, 770 F.3d at 114 (quoting Harris, 510 U.S. at 21). Although district courts may consider

23

facially neutral incidents in the totality of the circumstances, they may do so only if a reasonable jury could conclude that they were, in fact, based on the plaintiff's sex. Alfano, 294 F.3d at 378.

To substantiate her gender-based hostile work environment claim, Edelmann testified that Oberle told Edelmann that she was dressed "inappropriately" when she wore a long t-shirt over leggings or yoga pants; told Edelmann three times that one teacher thought Edelmann was wearing a push up bra while other teachers thought Edelmann "had a boob job";[4] and told Edelmann about a dozen times that she would make a wonderful mother, despite his knowledge that she had a hysterectomy. (Edelmann Dep. at 53:17–19; D.E. # 60-26 at 72:25–73:5, 75:6–8, 76:3–6; Edelmann Aff. ¶¶ 49–52.) Edelmann contends that, when making this last set of statements, Oberle was mocking her about her infertility. (See Edelmann Opp. at 7–10.) Although it is not clear that these statements can support a gender-based hostile work environment claim,[5] the Court will assume that they can for the purposes of this motion. Oberle's statement that Edelmann was dressed inappropriately cannot do so, however, because it is a facially neutral statement that a reasonable jury could not find related to Edelmann's sex. See Alfano, 294 F.3d at 378; Johnson v. Long Island Univ., 58 F. Supp. 3d 211, 225–26 (E.D.N.Y. 2014) (dismissing gender-based hostile work environment claim based on supervisor's statement to plaintiff "that he could not wear shorts and that 'dressing in cool temperature attire was a women thing'").

Oberle's three comments about Edelmann's breasts and repeated comments that she would make a wonderful mother, if meant as Edelmann interpreted them, were mean and inappropriate; but they fall short of establishing that discriminatory intimidation, ridicule, and insult permeated

---

[4] At oral argument, Edelmann claimed that Oberle made this statement five times, but her affidavit and deposition testimony only suggest three statements regarding Edelmann's breasts. (See Edelmann Aff. ¶¶ 48–49.)

[5] See Saks v. Franklin Covey Co., 316 F.3d 337, 346 (2d Cir. 2003) (stating that "[i]nfertility is a medical condition that afflicts men and women with equal frequency" and holding that discrimination based on infertility does not constitute sex-based discrimination); see also Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 198 (1991) (stating that, although discrimination based on "childbearing capacity" violates Title VII as modified by the Pregnancy Discrimination Act, discrimination on the basis of "fertility alone" would not).

Edelmann's workplace. Even taken together, they are insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment. See, e.g., Alfano, 294 F.3d at 374 ("We conclude that the twelve incidents cited by Alfano, taken together, are insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment."); Brown v. Coach Stores, 163 F.3d at 713 (holding that even "despicable and offensive" stray remarks "fail to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment").

That is so because, when a hostile work environment claim is based on a series of incidents, those incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Das, 369 F. App'x at 189–90 (quoting Alfano, 294 F.3d at 374); see also Littlejohn, 795 F.3d at 321 (quoting Raspardo, 770 F.3d at 114). "When properly applied, these standards 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Cintron, 242 F. Supp. 3d at 105 (quoting Faragher, 524 U.S. at 788).

Accordingly, courts have repeatedly dismissed hostile work environment claims in worse circumstances than those at issue here. See, e.g., Bailey v. Reg'l Radio Grp. LLC, No. 15-CV-375 (FJS), 2017 WL 1025948, at *4–6 (N.D.N.Y. Mar. 15, 2017) (granting summary judgment where the evidence of a hostile work environment included, among other things, a running "joke" in the office that there was a 120-pound weight limit for female employees; a different dress code for female employees; the defendant screaming and cursing at the plaintiff; and the plaintiff being subjected to unwanted comments on her appearance); Mazzone-Trani v. Donohue Cecere Funeral Home, No. 08-CV-60 (JS), 2010 WL 3282616, at *5 (E.D.N.Y. Aug. 13, 2010) (granting summary judgment where the record contained evidence that supervisors "made a few relatively mild

comments that could be considered sexist (e.g., calling her a 'mother hen,' suggesting that women get more emotional); . . . made some comments about her diet, and how people don't take overweight women seriously; . . . criticized her work performance in ways that lack any relation to her gender (e.g., . . . not adhering to . . . dress code)"); see also Romano v. Stora Enso Corp., No. 07-CV-4293 (NGG), 2010 WL 986535, at *58 (E.D.N.Y. Feb. 12, 2010) ("[T]o be actionable, defendants' conduct must have been so severe and pervasive as to create a 'poisoned' atmosphere in which the employee must 'run a gauntlet of sexual abuse' in order to perform her job.").

And, the Second Circuit's sex-based hostile work environment precedent involves comments that were far more vulgar, more frequent, more humiliating, and more threatening than those at issue here. See, e.g., Raniola v. Bratton, 243 F.3d 610, 619–20 (2d Cir. 2001) (evidence of highly offensive sexist comments, including the word "cunt" written across the plaintiff's name in an official ledger and a flyer posted in the elevator stating that the plaintiff was providing "free blowjobs"); Desardouin, 708 F.3d at 106 ("repeated solicitation of sexual relations in a vulgar and humiliating manner"). Much of the Second Circuit's precedent also included evidence that the plaintiff's supervisor unreasonably interfered with the employee's work performance.[6] See, e.g., Gregory, 243 F.3d at 693 (finding dismissal inappropriate, in part, because the plaintiff alleged that her supervisor undermined the plaintiff's supervisory authority and deprived her of necessary training); Raniola, 243 F.3d at 621 (finding summary judgment inappropriate, in part, because plaintiff proffered evidence of workplace sabotage and of a general singling out of the plaintiff "for discipline, for a heavier workload," and for undesirable assignments in an effort to make the plaintiff quit).

---

[6] The Court finds Edelmann's evidence of Oberle's purported workplace sabotage unpersuasive in the totality-of-the-circumstances analysis. Perhaps recognizing that no reasonable jury could conclude that Oberle engaged in his purported acts of workplace sabotage because of his animus against women, Edelmann chooses to use that evidence to support her disability-based hostile work environment claim instead. (See Edelmann Opp. at 10–11.)

At oral argument, Edelmann cited to <u>Howley v. Town of Stratford</u>, 217 F.3d 141 (2d Cir. 2000), as a case in which "just one specific comment" was enough to get the case to trial. <u>Howley</u> did not involve just one specific comment. <u>See id.</u> at 148. There, a defendant publicly told the plaintiff to "shut the fuck up, you fucking whining cunt." <u>Id.</u> He then proceeded to make public remarks concerning the plaintiff's menstrual cycle. <u>Id.</u> When other co-workers suggested that the defendant apologize, he yelled, in plaintiff's direction, "[t]here is no fucking way that I will apologize to the fucking cunt down there." <u>Id.</u> The plaintiff later confronted the defendant about his behavior, only to have the defendant launch "into an extended barrage of obscene verbal abuse, including at least one comment to the effect that the reason she did not make assistant chief was because she did not 'suck cock good enough and only made lieutenant.'" <u>Id.</u> The comments in <u>Howley</u> were far more vulgar, more frequent, and more humiliating than those at issue here.

Edelmann provides neither evidence upon which a reasonable jury could find that Oberle's comments altered the terms and conditions of Edelmann's employment, <u>Desardouin</u>, 708 F.3d at 105, nor citation to any precedent in which a court has allowed a hostile work environment claim to proceed on evidence similarly meager, (<u>see</u> Edelmann Opp. 7–14). There is no genuine issue of material fact regarding whether Edelmann suffered a work environment that "a reasonable person would find hostile or abusive." <u>Brown v. Henderson</u>, 257 F.3d at 252. Accordingly, the Court grants summary judgment to Defendants with respect to Edelmann's sex discrimination claims under 42 U.S.C. § 1983.

### III.    Supplemental Jurisdiction

Having disposed of Plaintiffs' federal claims, the Court declines to retain supplemental jurisdiction over Plaintiffs' remaining claims under New York State, City, and common law. Federal district courts have supplemental jurisdiction over state law claims "that are so related to

claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Subsection (c) of § 1367 enumerates circumstances in which a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a)." Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction." See also Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 102–03 (2d Cir. 1998) (holding that the district court properly exercised its discretion in declining supplemental jurisdiction after disposing of the federal claims on summary judgment); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). "The court must 'consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction' over the pendent claim." Raucii v. Town of Rotterdam, 902 F.2d 1050, 1055 (2d Cir. 1990) (quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Cohill, 484 U.S. at 350 n.7. Here, the Court has disposed of all claims over which it had original jurisdiction, and so declines to retain supplemental jurisdiction over Plaintiffs' remaining state claims. Accordingly, the Court remands these remaining claims to Kings County Supreme Court. See id. at 357 ("We conclude that a district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate.").

## CONCLUSION

For these reasons, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' remaining federal claims and declines to exercise supplemental jurisdiction over Plaintiffs' remaining state claims. Accordingly, the Court remands Plaintiffs' remaining claims for age, disability, and gender discrimination under New York State and City law, as well as Linell's remaining claim for defamation under New York common law, to Kings County Supreme Court. The Court respectfully directs the Clerk of Court to enter judgment accordingly and close this case.


SO ORDERED.

Dated: March 30, 2018
      Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge